## County Commissioners v. Chandler.

1. A bridge intended for and used as a thoroughfare is a public highway, and hence a work of internal improvement, within the meaning of the act of Nebraska passed Feb. 15, 1869, authorizing cities, counties, and precincts in that State to issue bonds in aid of works of internal improvement.

2. The fact that the bridge, in aid of the construction of which the bonds were issued, was built as a toll-bridge, and is used as such, does not affect their validity in the hands of a *bona fide* holder for value before maturity.

Error to the Circuit Court of the United States for the Northern District of Nebraska.

This was an action brought by George B. Chandler to recover the amount of certain coupons attached to certain bonds issued by the board of county commissioners of the county of Dodge, in the State of Nebraska, on behalf of the precinct of Fremont in said county. Chandler purchased the coupons sued on before maturity, and for a valuable consideration. The controversy in the case relates to the validity of the bonds and his title to the coupons.

By a law of the State of Nebraska, passed Feb. 15, 1869, it was enacted that any county or city in the State should be authorized to issue bonds to aid in the construction of any railroad or other work of internal improvement, the amount to be determined by the county commissioners of such county or the city council of such city, not exceeding ten per cent of the assessed valuation of all taxable property in said county or city : *Provided*, the county commissioners or city council should first submit the question of issuing such bonds to a vote of the legal voters of said county or city in the manner provided by chap. 9 of the Revised Statutes of Nebraska for submitting to the people of a county the question of borrowing money. By a subsequent section, it was enacted that any precinct in any organized county of the State should have the privilege of voting to aid works of internal improvement, and be entitled to all the privileges conferred upon counties and cities; and that in such cases the precinct election should be governed in the same manner, so far as applicable, and the county commissioners should issue special bonds for the precinct.

It thus appears that the board of county commissioners had sufficient power to issue bonds for the precinct, if authorized and required so to do by the latter, for the purpose of aiding works of internal improvement.

In the present case, the bonds purport on their face to have been thus issued. The following is a copy of one of them :—

"UNITED STATES OF AMERICA, }
  "STATE OF NEBRASKA:         }

"It is hereby certified that Fremont Precinct, in the county of Dodge, in the State of Nebraska, is indebted unto the bearer in the sum of $1,000, payable on or before twenty years after date, with interest at the rate of ten per cent per annum from date. Interest payable annually on the presentation of the proper coupons hereto annexed. Principal payable at the office of the county treasurer, in Fremont, Dodge County, Nebraska. Interest payable at the Ocean National Bank, in the city of New York.

"This bond is one of a series issued in pursuance of and in accordance with a vote of the electors of said Fremont Precinct, at a special election held on the eleventh day of November, A.D. 1870, at which time the following proposition was submitted :—

"'Shall the county commissioners of Dodge County, Nebraska, issue their special bonds on Fremont Precinct, in said county, to the amount not to exceed $50,000, to be expended and appropriated by the county commissioners, or as much thereof as is necessary, in building a wagon-bridge across the Platte River, in said precinct; said bonds to be made payable on or before twenty years after date, bearing interest at the rate of ten per cent per annum, payable annually; which proposition was duly elected, adopted, and accepted by a majority of the electors of said precinct voting in favor of the proposition.'

"And whereas the Smith Bridge Company of Toledo, Ohio, have entered into a contract with said county commissioners to furnish the necessary materials and to build and construct said bridge referred to in the foregoing proposition; therefore, this bond with others is issued in pursuance thereof, as well as under provisions of an act of the legislature of the State of Nebraska, approved Feb. 15, A.D. 1869, entitled 'An Act to enable counties, cities, and precincts to borrow moneys on their bonds, or to issue bonds to aid in the construction or completion of works of internal improvements in this State, and to legalize bonds already issued for such purposes.'

"In witness whereof, we, the said county commissioners of said Dodge County, have hereunto set our hands, this first day of September, A.D. 1871."

[Signed and sealed by the county commissioners.]

It is conceded that the precinct regularly voted for an issue of bonds to the amount named therein, to be appropriated for building a bridge across the Platte River; but the defendant, in its answer, set forth the notice of the election, by which it appears that the proposition submitted to the people was to build a toll-bridge and not a free bridge; and that the bridge was accordingly built and operated as a toll-bridge. The notice of election further declared that the tolls were to be used for the purpose of raising a sinking fund to pay the principal, interest, repairs, and expenses of the bridge, and were to be regulated from time to time by the county commissioners.

The plaintiff demurred to this answer. The demurrer was sustained, and judgment rendered in his favor. In the argument below, three questions were raised, on which the judges were divided in opinion; and it is on this division of opinion that the case comes here. The questions were as follows: —

1. Whether the said answer sets up a sufficient defence in law to the causes of action stated in the petition.

2. Whether the recital in the bond charged the holder thereof with notice of the proposition, which was in fact the one submitted to a vote of the people, as contained in and shown by the records of the county.

3. Whether the fact that the bonds were issued for a toll-bridge of the character of the one set forth in the proposition submitted to the votes of said Fremont Precinct, as shown in the answer, makes them invalid in the hands of the holder thereof for value before due, without other notice than that imparted on the face of the bonds.

*Mr. W. A. Marlow* for the plaintiffs in error.

*Mr. W. H. Munger, contra.*

MR. JUSTICE BRADLEY, after stating the case, delivered the opinion of the court.

In approaching the solution of the questions presented by this certificate, the first inquiry that naturally presents itself is,

whether a toll-bridge like that referred to is a public bridge, and hence a work of internal improvement. And we can hardly refrain from expressing surprise that there should be any doubt on the subject. What was the bridge built for, if not fit for public use? Certainly not for the mere purpose of spanning the Platte River as an architectural ornament, however beautiful it may be as a work of art; nor for the private use of the common council and their families; nor even for the exclusive use of the citizens of Fremont. All persons, of whatever place, condition, or quality, are entitled to use it as a public thoroughfare for crossing the river. The fact that they are required to pay toll for its use does not affect the question in the slightest degree. Turnpikes are public highways, notwithstanding the exaction of toll for passing on them. Railroads are public highways, and are the only works of internal improvement specially named in the act; yet no one can travel on them without paying toll. Railroads, turnpikes, bridges, ferries, are all things of public concern, and the right to erect them is a public right. If it be conceded to a private individual or corporation, it is conceded as a public franchise; and the right to take toll is granted as a compensation for erecting the work and relieving the public treasury from the burden thereof. Those who have such franchises are agents of the public. They have, it is true, a private interest in the tolls; but the works are public, and subject to public regulation, and the entire public has the right to use them. These principles are so elementary in the common law, that we can hardly open our books without seeing them recognized or illustrated. Comyns's Digest, title "Toll-thorough," commences thus: "Toll-thorough is a sum demanded for a passage through an highway; or, for a passage over a ferry, bridge, &c.; or, for goods which pass by such a port in a river: and it may be demanded in consideration of the repair of the pavement in a high street; or, of the repair of a sea-wall, bridge, &c.; cleansing of a river, &c. But toll-thorough cannot be claimed simply, without any consideration." These few sentences indicate conclusively that the existence of a toll is not inconsistent with the public character of the work on which it is exacted.

Of course, there may be private bridges as there may be pri-

vate ways, and they are put in the same category by the text-writers. Woolrych on Ways, 195. But all bridges intended and used as thoroughfares are public highways, whether subject to toll or not. Regularly, all public bridges are a county charge, and the county is bound to erect and maintain them. 1 Bla. Com. 357. But others may be charged with this duty, and a toll is the commonest of means for obtaining compensation for its performance. In Angell on Highways, it is said that .public bridges may be divided into three classes: "First, those which belong to the public, as State, county, or township bridges, over which all people have a right to pass, without or with paying toll; these are built by public authority at the public expense, either of the State itself, or of a district or portion of the State; secondly, those which have been built by companies (like turnpike and railroad companies) or at the expense of private individuals, over which all persons have a right to pass on the payment of a toll fixed by law; thirdly, those which have been built by private individuals, and which have been surrendered or dedicated to the use of the public." Angell on Highways, sect. 38., Chancellor Kent says: "The privilege of making a road or establishing a ferry, and taking tolls for the use of the same, is a franchise, and the public have an interest in the same; and the owners of the franchise are answerable in damages if they should refuse to transport an individual without any reasonable excuse, upon being paid or tendered the usual rate of fare." In the same connection, he enumerates in this class of franchises ferries, bridges, turnpikes, and railroads. 3 Kent, Com. 458, 459.

But it is unnecessary to continue the discussion further. In our judgment, the bridge in question is a public bridge, and a work of internal improvement within the meaning of the statute.

Whether the precinct or the county commissioners have the right, without further legislative authority, to demand tolls for passing on the bridge is a totally different question, and one that does not, in our judgment, affect the validity of the bonds. The bridge being an internal improvement, the precinct had the power to aid in its construction. This it resolved to do, and on this resolve is founded the issue of the bonds. Whether

it should get any consideration from the public in return was a question in which the purchaser of the bond is not concerned. A resolve to make the bridge a toll-bridge was an incidental matter, that might or might not be valid, and might or might not be carried out, if valid, without affecting the main purpose, — the construction of the bridge, or the bonds issued in aid of its accomplishment. The toll question was an incidental one, in which the precinct alone was beneficially interested. If in the execution of their power to aid in the construction of the bridge the people of the precinct proposed to get some return in the shape of tolls, and should find that they had no authority to exact them, how can that affect their bonds, to issue which their power was undoubted? In voting the bonds, they may have acted, and undoubtedly did act, under the expectation that the proposed tolls would relieve them from some taxation for their payment; but, if mistaken in this, — that is, in their power to exact tolls, — how can this affect the bonds? And how can their want of power to exact tolls concern the purchaser of the bonds? The truth is, the two things — the power to aid in the construction of the bridge, and the power to stipulate for tolls thereon — are distinct; and in that light they should be viewed on the question of the validity of the bonds. The bridge is an accomplished fact, a public improvement, of which the public and the people of Fremont have the benefit; and its erection is due to those who advanced their money on the bonds. There are some equities in the case that ought not to be entirely ignored in considering, not the powers of the precinct, but the manner in which it has attempted to exercise them. If any party is to suffer from a mistake of law in respect to the power of exacting tolls, equity and justice require that it should be that party which has received the benefit, and not the party that advanced the consideration. This principle should always govern when it involves no violation of any rule of law.

We deem it unnecessary to advert to other points made in the argument. They present nothing that requires distinct consideration.

On the whole, we are of opinion that the answer does not set up a sufficient defence in law to the cause of action stated in

the petition, whether the plaintiff had notice of the election proceedings and of the character of the proposed bridge or not before purchasing the coupons on which the suit is brought.

This conclusion requires, and our judgment is, that the first and third questions should be answered in the negative, and that the second question is immaterial; and, consequently, that the judgment of the Circuit Court should be affirmed.

*Judgment affirmed.*